**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
CIVIL DIVISION

—————————————————— )
                                           )
**COREY L. MCFADDEN**                      )
20016 Gateshead Circle                     )
Germantown, Maryland 20876                 )
                    Plaintiff,             )
                                           )
              v.                           )     Civil Action No. 1:14-cv-01115
                                           )     Judge Reggie B. Walton
**WASHINGTON METROPOLITAN**                )
**AREA TRANSIT AUTHORITY, et al.**         )
600 Fifth Street, N.W.                     )
Washington, D.C. 20001.,                   )
                    Defendants.            )
—————————————————— )

# PLAINTIFF'S SECOND AMENDED COMPLAINT

Comes now Plaintiff, Corey L. McFadden by way of Complaint against the Defendants

Washington Metropolitan Area Transit Authority, Amalgamated Transit Union Local 689, and the

individual capacity defendants listed in the "Parties" section below saying as follows:

## NATURE OF THE ACTION

1.      This action is brought under Section 501 and 505 of the Rehabilitation Act,   29 U.S.C. § 794(a)

        for disability discrimination retaliation, and hostile work environment.

2.      This action is brought under Title I and Title V of the Americans with Disabilities Act of 1990, as

        amended

3.      This action is brought under sections 102 and 103 of the Civil Rights Act of 1991

4.      This action is also brought under section 301 of the Labor Management Relations Act, 29 U.S.C.

        § 185 for breach of duty of fair representation.

5.      This action includes District of Columbia and/or Maryland common law claims for defamation,

        intentional infliction of emotional distress civil conspiracy and assault.

## JURISDICTION

### SUBJECT MATTER JURISDICTION

6.   The Court enjoys subject matter jurisdiction over this case as it predominately concerns a federal question and claims under federal law.  28 U.S.C. § 1331.

7.   The Court enjoys subject matter jurisdiction for the common law claims being brought against the defendants under the principle of supplemental jurisdiction.   28 U.S.C. § 1367 and 437 U.S. 365

8.   The Court has jurisdiction over these disputes.

9.   Plaintiff's claims are properly before this Court, as he has exhausted his administrative remedies through the U.S. Equal Employment Opportunity Commission ("EEOC").  EEOC issued of right to sue letters to Mr. McFadden, attached as Appendixes A and B.  The right to sue letter, dated March 31, 2014, was received on April 04, 2014, and Plaintiff files the instant action within the requisite 90-day period. The right to sue letter, dated April 03, 2014, was received on April 06, 2014, and Plaintiff filed the instant action within the requisite 90-day period.

### PERSONAL JURISDICTION AND VENUE

10.   This Court has jurisdiction over the Defendants pursuant to 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 12117 (a), the Civil Rights Remedies Equalization Act, 42 U.S.C. § 2000d-7(a)(1), _____, and the District's Long Arm Statutes .

11.   This Honorable Court is the proper venue for this action since Washington Metropolitan Area Transit Authority is headquartered in the District of Columbia, continuously conducts business in the District of Columbia and virtually all of the events giving rise to the claims asserted herein occurred in the District of Columbia.

### PARTIES

12.     The Plaintiff, Corey McFadden is a natural person who is, and all times relevant herein, was a resident of the State of Maryland.  He is an employee of Defendant Washington Metropolitan Area Transit Authority within the meaning of 42 U.S.C. 12111(4).

13.     Defendant Washington Metropolitan Area Transit Authority (hereinafter referred to as "WMATA" or "Company") is a mass transit system for the District of Columbia and surrounding suburban areas that was created by an interstate compact by Maryland, Virginia, and the District of Columbia, D.C. Code § 9-1107.01.  WMATA's headquarters is located at 600 Fifth Street, N.W., Washington, D.C. 20001.  With 1 exception, the events of this case occurred at WMATA's jobsite located in Northwest Washington, D.C. and at its medical compliance branch also located in Northwest Washington, D.C.   WMATA is an employer, as defined by D.C. Code § 32-1002(3) and 42 U.S.C. § 12111(5), with over 500 employees.

14.      Defendant Amalgamated Transit Union Local 689 (hereinafter referred to as Local 689) is a Labor Union which represents the majority of WMATA's workforce. Its charter was granted in January of 1916. Local 689's headquarters is located at 2701 Whitney Place, Forestville MD, 20747.

15.     Defendant Lisa Cooper-Lucas is a natural person who is, and all times relevant herein, was a resident of the State of Maryland. She is the Manager of WMATA's Medical Service and Compliance Branch. She is an individual subject to personal liability under District of Columbia and/or Maryland law.

16.     Ron Kelly is a natural person who is, and all times relevant herein, was a resident of the State of Maryland. He is a Counselor within WMATA's Employee Assistance Program and Substance Abuse Professional. He is an individual subject to personal liability under District of Columbia and/or Maryland law.

17.      John Coleman Jr. is a natural person who is, and all times relevant herein, was a resident of the State of Maryland and wasWMATA's Superintendent of Bus Maintenance at Western Division. He is an individual subject to personal liability under District of Columbia and/ or Maryland law.

18.     Gina Pervall is a natural person who is and at all times relevant herein, was a resident of the State of Maryland. She physician within WMATA's Medical and Compliance branch and a Medical Review Officer. She is an individual subject to personal liability under District of Columbia law and/or Maryland law.

19.     James Lipscomb is a natural person who is and at all times relevant herein, was a resident of the State of Maryland. He was Plaintiff's immediate Supervisor in WMATA. He is an individual subject to personal liability under District of Columbia law and /or Maryland law.

20.     Donna Gaffney is a natural person who is and at all times relevant herein, was a resident of an unknown state. She is an attorney within WMATA's labor relations department.  She is an individual subject to personal liability under District of Columbia, Maryland, and/or Virginia law.

21.     Leonard Hertzberg is a natural person who is and at all times relevant herein, was a resident of the State of Maryland. He is a licensed psychiatrist. He is an individual subject to personal liability under District of Columbia and/or Maryland law.

22.     Renee Y. Thomas is a natural person who is and at all times relevant herein, was a resident of Alabama. She is a counselor at Cahaba Psychology Center in Hoover Alabama.  She is an individual subject to personal liability by District of Columbia, Alabama, or Maryland law.

23.     Joseph Bowie is a natural person who is and at all times relevant herein, was a resident of the State of Maryland. He is a Supervisor in WMATA. He is an individual subject to personal liability under District of Columbia and/ or Maryland law.

## FACTUAL ALLEGATIONS

24.     Defendant WMATA hired Plaintiff Corey McFadden on or about October 6, 2008 as a Bus Mechanic.

25.     The essential functions of a Bus Mechanic are;

a)  Employee performs basic to complex maintenance work on WMATA vehicles.

b) Employee gains familiarity with and develops skills in the operation, maintenance and repair of WMATA vehicles and equipment.

c) Employee receives instruction and close supervision on new assignments, while regular assignments are performed independently.

d) Work is reviewed and verified to check progress and conformance to established policies and requirements by a Lead Mechanic or Garage Shift Supervisor.

e) Performs tasks in any of several areas of the bus maintenance activity.

f) Performs major repairs on all designated component parts of vehicles and analyzes and corrects those components having special or new problems.

g) Conducts technical diagnostics

h) Performs major engine work, etc.

i) Performs all tasks in conformance with safety and maintenance practices and procedures.

j) Uses various types of test equipment and related specialized tools associated with job assignment.

k) Completes required documentation and reports for the operation and maintenance of WMATA vehicles and related components by using the proper forms and tags.

l) Attends on the job and formal training classes.

m) Assists higher classified co-workers in their assignments.

n) Provides job specific training to lower classified co-workers.

o) Performs flame cutting and basic welding operations, brazing and soldering as required.

p) Responds to and provides assistance in emergencies such as securing or safeguarding WMATA vehicles and equipment, fire/life/safety, snow emergencies, etc.

q) Operates Authority vehicles as required.

r) Works various hours, locations, and days as required.

s) Maintains cleanliness of work area.

t) Performs tasks which may include heavy physical labor.

Plaintiff is qualified to perform the essential functions of a Bus Mechanic with or without (a) reasonable accommodation(s).

26. The plaintiff suffers from a mental impairment which substantially impairs the operation of major bodily functions, including but not limited to: thinking, remembering (working memory), communicating and concentrating. His condition is permanent and of lifelong duration. His condition is of such a manner that it affects his ability to initiate and complete tasks in a timely manner; maintain attention for long periods of time on mundane task ; consider consequences before acting; regulate his emotions; sit still for long periods of time and effectively communicate ideas and feelings to others.

27. In or about June of 2009, due to these and related impairments, a physical examination, review of medical history, and other medical observations, Rhonda Winfield diagnosed Plaintiff with Attention Deficit Hyperactivity Disorder ("ADHD"). Dr. Peter Blaes, who specializes in psychiatric disorders, concurred in the diagnosis and prescribed a treatment plan for Plaintiff to manage his symptoms, which included the prescription drug Adderall. He ordered Plaintiff to take one 20mg XR capsule of Adderall daily. He later prescribed Plaintiff to take an additional 10mg short acting pill of Adderall as needed to help increase his focus and concentration when his work schedule demanded longer periods than the 20mg was active.

28. Without medication to ameliorate the impairments caused by ADHD, Plaintiff experiences the substantial impairments to major bodily functions described above.

29. This civil action rise the pervasive attacks upon Plaintiff by employees and agents of WMATA's management and administrative teams which includes but was not limited to using knowledge of his ADA recognized disability to, fabricate false concern for safety where none legitimately existed, and cause or attempt to cause work related incidents to unjustly label Plaintiff as a "direct threat" and medically disqualify him. The actions were taken for the purposes of retaliating against Plaintiff engaging in the protected action of filing and amending charges of discrimination and retaliation with the United States Equal Employment Opportunity Commission Washington Field Office. The

defendants meticulously planned these attacks in a manner which would make further charges hard to prove and provide the illusion of valid affirmative defenses should litigation arise as a result. Plaintiff's unconventional and factual rebuttal to each attack forced the defendants to react in ways they did not anticipate. As a result the defendants' knee jerk responses highlight the conspiratorial plot which began during Plaintiff's Reinstatement/ DOT physical.

30.  Individuals of all levels of management including Richard Sarles, WMATA's former general manager were aware of the attacks that were instituted by individuals within the Office of Human Resources, and Bus Maintenance. The company consolidated around the individuals who initiated the attacks identified in Civil Action 1:12-cv-00940 RBW and authorized initiation of a covert plan to claim Plaintiff's ADA recognized disability made him a direct threat by exposing him to hostile and discriminatory work practices which targeted deficits caused by Plaintiff's disability. Plaintiff was held to a higher standard than those without a disability. This elaborate attack enlisted the cooperation of top management personnel within the Office of Human Resources, its subdivision, the Medical and Compliance Branch, Bus Maintenance, and Office of Labor Relations to conceal the fact that this had become a company wide effort and was no longer the misdeeds of a select few individuals. The perceived disjointed actions minimized the chance that Plaintiff would realize the people sought refuge from were the same people using the information he provided to attack him and attempt to cover up their misdeeds.

31.  Jackie Jeter, Douglas Taylor, John Coleman, Lisa Cooper-Lucas and Ron Kelly covertly orchestrated a plan to have Plaintiff forcibly placed in WMATA's Employee Assistance Program as a condition of his November 2011 reinstatement to the position of a Garage Bus Mechanic so that he could be medically disqualified shortly after. This plan was unsuccessful because of Plaintiff's staunch opposition to EAP.

32.  Jackie Jeter, Douglas Taylor, John Coleman, Lisa Cooper-Lucas and Ron Kelly covertly orchestrated a revised plan for Plaintiff's management team to use knowledge of Plaintiff's disability to target known deficits it causes. This was to be accomplished by manipulating Plaintiff's job

assignments to heighten the chances of him making focus related mistakes while simultaneously creating an oppressive, tension filled working environment, to trigger impulsive emotional reactions to the constant verbal, sometimes physical, and psychological attacks. They planned to isolate Plaintiff from his coworkers and to have them ostracize him. The defendants spread rumors of Plaintiff alerting management to his co-workers misdeeds which created tension and distrust between he and his co-workers. In response, the plaintiff's Co-Workers turned a blind eye to managements' attacks upon him. They planned to document Plaintiff's probable mistakes and emotional reactions so that he could be referred to an Independent Medical Evaluation (IME) and medically disqualified. Assuming that Plaintiff would file grievances as the implementation of the plan proceeded, Jackie Jeter's role would be to prevent the union rep handling the grievances from pursing them fully. Douglas Taylor's role would be to insulate Jackie Jeter's involvement and to conceal pertinent facts from the grievance and arbitration records so that each attempt for restitution and vindication would fail while simultaneously using the grievance process and arbitration process as a way of creating a record combat the probable civil litigation arising out of the EEOC complaint that was being investigated by the EEOC and to create a back story that would give the illusion of valid nondiscriminatory reason for the attacks be planned. This plan was agreed to and implemented by Jackie Jeter, Douglas Taylor, John Coleman, Lisa Cooper-Lucas and Ron Kelly. This alliance was formed during the actions which preceded Plaintiff's March 2011 termination and is the reason Douglas Taylor declined Plaintiff's request to represent him due to a conflict of interest.

33. Each of the individual capacity defendants that are employed by WMATA took actions far outside of the discretionary governmental job functions and proprietary job functions, of their positions. In so doing, they have exposed themselves to personal liability under District of Columbia Common law or common law in the states they reside.

34. Defendant Lisa Cooper-Lucas attempted to force Plaintiff to re-enroll in EAP as a condition to his reinstatement in or about October 2011. Plaintiff refused. The EAP requirement was waived. This

provision was not contained in the settlement agreement signed by WMATA's and Local 689's representatives.

35.     Plaintiff was required to submit to Department Of Transportation Physical on or about October 17 2011, at WMATA's Medical and Compliance branch. The DOT physical was started by an unknown female Physician Assistant of Asian descent. Dr. Gina Pervall completed the Physical. Plaintiff submitted a prescription reporting form to Dr. Pervall identifying the medication and dosage he was taking to ameliorate the symptoms of his disability. She informed Plaintiff that Dr. Blaes would be required to complete a "Physician's Statement" form in order before he would be permitted to take Adderall. Dr. Pervall said that Plaintiffs' blood pressure was higher than the Department of Transportation limit. Plaintiff's elevated blood pressure was caused by extreme anxiety stress and fear because Defendant Lisa-Cooper Lucas, one of the people that was instrumental in his unjustified termination, was the head of the department which had the ultimate decision in whether or not he would be allowed to return to work. Before having his blood pressure readings taken, an unknown person performing Plaintiff's vision test had already claimed that Plaintiff's eye sight with corrective lenses was 20/60, far below the 20/40 DOT vision standard. Shortly prior to his physical at WMATA, plaintiff had a routine eye exam which documents 20/20 vision in each eye with corrective lenses. By the time that Plaintiff's blood pressure was taken, he suspected that the Medical department was erroneously claiming he had medical conditions in order to delay his return to work and possibly prevent him from returning permanently. This stress and anxiety caused a spike in his blood pressure. It was compounded by a concern that WMATA's delay in his return to work would affect his ability to meet financial obligations. Plaintiff's wife was in the final days of pregnancy with their daughter. Plaintiff needed to resume working so that his health care benefits could be reinstated. The pediatrician they chose did not accept the public assistance health care plan. Dr. Pervall instructed Plaintiff to bring in documentation from his primary care physician, his optometrist and Dr. Blaes as a condition to being permitted to return to work. Dr. Blaes completed a form Dr. Pervall issued him and it was faxed back to the medical department. On or about October

19, 2011. Plaintiff was issued a DOT card from Dr. Gina Pervall on November 05, 2011 and was cleared to return to Safety Sensitive Duty as a Bus Mechanic at Western Division.

36.     Plaintiff's first day back at work was scheduled for November 06, 2011. Plaintiff opted to use his Personal Holiday, a benefit guaranteed in the WMATA/ Local 689 Collective Bargaining Agreement. (CBA).  It guarantees all Local 689 members a paid day off on their birthday. Plaintiff started working at Western Garage on November 07, 2011. He was initially assigned a temporary position on the day shift until the "bump" down could be instituted.

37.     Plaintiff was assigned to pressure wash the engine compartments of the buses every day that week. Pressure washing engine compartments is an unskilled labor assignment which has traditionally been reserved for individuals in the Fleet Servicer Job Classification. Mr. Eades, the day shift Leadman, at Western division during this time informed Plaintiff that he was instructed to assign this work to Plaintiff for the entire week. He informed Plaintiff that he wouldn't have to worry about doing this menial work once he moved to evening shift the following week because the day shift is the only shift that can pressure wash the buses when there is sufficient daylight and a sufficient number of buses at the division to accomplish the task without reducing the number of buses available to go into revenue service during the morning and evening rush hours.

38.     The pressure washing pit is attached to the division on the south side of the building. It can only be accessed from an alley on 44th street. To pressure wash a bus, the employee must to pull out of the bus parking lot onto 44 Street NW and drive to the opposite side of the building. To get the old style buses (Orion 5 and 6) into the pressure washing bay, the employee would have to back the bus across busy business / residential 44th Street into the bay. The Garage door for the pressure washing bay is approximately 8 to 10 inches wider than the bodies of the old style buses. The mirrors have to be folded in to clear the bay door opening and back up blindly for a foot or two while maneuvering from left to right to ensure the mirrors don't catch or rub the wall. Once the mirrors are clear of the entrance, the employee can fold the mirrors back out and continue back up to properly align the bus over the pit.

39.     The new style buses are larger than the older buses they are replacing. To pressure wash the engine compartments, the employee pulls into the division employee parking lot head in and then backs up to the rear of the pressure washing bay. To do the underside of the bus, Plaintiff was instructed to lie on the ground as necessary. This placed his life in danger if anyone were to move the bus or release parking brake.

40.     When pulling the new buses out, the person driving is required to do so by either backing the bus across the busy street into the adjacent alley, then pulling forward with only inches between the bus and the parked cars, impatient motorist trying to squeeze past the bus, poles, signs and consumers walking to retail area one block over. The only other option is to start to angle the bus early while backing up so that the rear wheel drops off the curb giving the employee just enough room to clear the parked cars. Deciding which method to use is dependent on how the cars are parked on 44th street. At times nothing can be done but to wait for consumers and residents to move their vehicles.

41.     Within WMATA, any physical contact of a mirror or any other portion of a bus, no matter how slight is classified as a minor preventable accident. Having two to three of these accidents in a 365 day period year is justified grounds for suspensions. A fourth minor preventable accident in a 365 day period is grounds for termination.

42.     Plaintiff did this work as assigned and developed a system to ensure his safety was not compromised. He drained the air tanks and left the air valves open so that the brakes could not be released.

43.     After moving to evening shift, Plaintiff continued to be assigned to pressure wash the buses until there wasn't sufficient day light. Following that assignment, he was assigned to the service lane for the second half of the shift. Kelvin Rufus, evening shift leadman would routinely come outside and observe Plaintiff back each bus in and out but would never offer any assistance. On multiple occasions he instructed other employees to return to their work area inside the garage making Plaintiff do so without any assistance. This was a blatant violation of WMATA's policy on backing up buses. Plaintiff was rarely assigned to work in his regular job classification.

44.     Kelvin Rufus and Joe Bowie, a day shift supervisors began complaining that Plaintiff was taking too long to pressure wash the buses. Plaintiff explained that he would have to wait for buses to return to the division from revenue service before he could begin. Around the same time, one of the mechanics informed Plaintiff that Kelvin Rufus told others on the shift that he kept putting, Plaintiff outside alone because he would "eventually fuck something up."

45.     Management assigned Plaintiff this job as a way of isolating him from the other employees which made it easier spread rumors to turn his co-workers against him. It also minimized the chance that one of them would be present to warn him if an accident were about to occur. A momentary lapse in concentration while performing this repetitive and uninteresting task could have led to a minor or catastrophic accident that he could be disciplined or terminated for. This assignment was specifically designed targeted impairments brought on by Plaintiff's disability.

46.     Plaintiff began complaining to his Supervisor, defendant James Lipscomb about the discriminatory actions being taken against him but chose not to file a grievance and complaint at that time. Filing the grievance or complaint would have forced plaintiff to reveal the employee that warned him of what was occurring. Plaintiff did not want to put anyone in a position to be retaliated against for choosing to not go along with the program.

47.     In response, Plaintiff requested two reasonable accommodations, with Roslyn Rikard. He asked to be given more time to complete tasks. He also requested to have his medical file noted of the medication and dosage he took for his disability and have the internal monthly reporting requirement waived unless there was a change. The settlement agreement which reinstated his employment allowed a 30 day suspension to remain on his record for not reporting his prescription as required by the WMATA prescription reporting policy. Plaintiff had routinely submitted his prescriptions but Jackie Jeter agreed to drop one of Plaintiff's grievances surrounding his termination. This grievance stated that he had always submitted his prescription forms on or before time. As a result the 30 day suspension was allowed to remain on Plaintiff's record and give the illusion that their previous actions were partially justified. A second violation for not reporting a prescription would have been

grounds for Plaintiff's immediate termination. Plaintiff feared that if there was a second claim that he had failed to submit his prescriptions, whether legitimate or not, he would be terminated.

48.     John Coleman was attempting to manipulate Plaintiff by using knowledge of his disability to him placed in mundane assignments and situations to cause a momentary lapse in attention and or judgement which he hoped would then lead to violation of WMATA's Standard Operating Procedure and Rules and Regulations that he could be disciplined for.

49.     In the rare occasion that man power shortages required that he be given work within his classification, Kelvin Rufus would require that Plaintiff worked in the bay closest to the maintenance office so that he could stand over Plaintiff to  intimidate and distract him. The only other time Plaintiff was assigned work within his classification is Friday's, one of Kelvin Rufus' assigned days off.  Mr. Harris, the acting Leadman on most of these days refused to assign Plaintiff to his normal task of pressure washing the buses.

50.     Plaintiff complained to his Supervisor, defendant James Lipscomb for the differential treatment in his assignments. Plaintiff was the most senior and most experienced mechanic D on evening shift, yet he was continuously given the most menial job assignments.

51.     Between November and December, Kenneth Cooper, and Plaintiff were the only mechanics with CDL Class A licenses and experience to tow buses on evening shift. Kenneth Cooper's DOT medical card had expired. The medical and compliance branch were reluctant to issue him a new DOT card due to sleep apnea. Plaintiff was the only person that was qualified to tow buses when one became disabled or developed an unsafe condition while in revenue service. During this time, Plaintiff took the initiative to train one of the new mechanics, Marlin Speed, on proper shifting techniques, proper techniques to lift the bus and the most novice friendly routes to different parts of Washington DC. Once the mechanic was comfortable operating the tow truck, Plaintiff became the last option to send out. Plaintiff enjoyed towing. It allowed him a periodic break from the stressful environment he was forced to endure.

52.     In January of 2013, Plaintiff was assigned to bring bus 2046 back to the garage after it was involved in a minor preventable accident on Pennsylvania Avenue SE. While driving the bus, Plaintiff immediately noticed that the brakes were not working well. Plaintiff found a safe location to pull over and called the division for the tow truck.

53.     A week later, Plaintiff was notified that he was under investigation for unnecessarily towing the bus. All of WMATA's written policies advice operators to err on the side of caution. There is no policy which specifically governs the tow truck request and operation. The bus was inspected and eventually returned to service.

54.     The following day, Plaintiff noticed that the same bus was on the lift with the right side brakes partially dissembled. One of the most senior management officials from the offices of Bus Reliability and Quality Assurance was present, taking pictures and inspecting parts to find out what caused the right rear brakes to experience a complete failure.

55.     The documentation shows that less than 10 hours after being released back into service, most of which it was parked on the lot at Western Division, the right rear wheel experienced catastrophic wheel and brake failure causing the rear wheels to separate from the bus as it pulled into Fort Totten.

56.     The brake geometry measurements and brake temperatures recorded by the mechanic who inspected the bus and returned it to revenue service were well outside of specifications and was a warning of the impending failure. The 2000 series buses are configured in such a way that there is no way to perform a thorough visual inspection of the shoes drums and anchor pins without removing the wheels. The wheels were not removed as part of the inspection.

57.     The documentation entered into Maximo also shows that Ralph Bonucelli enlisted the help of multiple day shift mechanics to perform a Vericom brake test in a manner that was not consistent with the policy that governs how Vericom brake tests are to be performed. He did not attempt to duplicate the conditions the bus would have been in when Plaintiff transported it and without alerting Plaintiff to what was occurring. The documentation shows that Ralph Bonuccelli altered the mechanics Maximo entries after the day shift mechanics had left for the day.

58.     John Coleman instructed Ralph Bonucelli to compose a written reprimand accusing the Plaintiff of unnecessarily towing buses for bus 2046 as well as 2 other buses that management were retroactively claiming didn't need to be towed. Their initial plan to write up Plaintiff was spoiled by 2046's catastrophic brake failure. The decision to research Plaintiff towing history was an attempt salvage an attempt to target and attack Plaintiff with  discipline with falsified accounts of poor work performance. Defendant James Lipscomb issued the write up to Plaintiff but could not answer any specific questions Plaintiff asked. He referred Plaintiff to Ralph Bonuccelli. Plaintiff asked Ralph Bonuccelli to provide him a Maximo printout showing every bus that he had towed since his reinstatement. Ralph Bonucelli pulled a preprinted list out of his personal bin on his desk. James Lipscomb was Plaintiff's supervisor. It was James Lipscomb's responsibility to investigate Plaintiff's conduct.  The list produced showed that Plaintiff was assigned to go to the Tenley Town bus bays to tow bus 3915 back to the garage. Upon arriving Plaintiff assisted the mechanic in jump starting the bus, checking the electrical system and followed him back to the garage in the tow truck. This proved that Plaintiff was not arbitrarily towing buses. Plaintiff submitted a written statement explaining why each bus needed to be towed. Plaintiff filed a grievance for the unjustified written reprimand. John Coleman would only agree to reduce the written reprimand to a letter of instruction.

59.     Shortly thereafter in a failed attempt to taunt Plaintiff into an ADHD triggered emotional response, Kelvin Rufus told Plaintiff that eventually he would "Fuck something up" referencing knowledge of Plaintiff's disability and continuously assigning Plaintiff to mundane tasks. Plaintiff filed a grievance and complaint through his union alleging disability discrimination by Defendant John Coleman and Kelvin Rufus in his job assignments.

60.     In March of 2013, defendant Gina Pervall informed the plaintiff that he was going to be required to attend an Independent Medical Evaluation (IME) with Dr. David Fischer. The letter threatened Plaintiff with "Administrative Action" if he did not attend the IME. "Administrative Action" is same term that was used to terminate Plaintiff in March of 2011. At the recommendation of his former Attorney, Plaintiff did not attend the IME.

61.     On or about April 03, 2013 Plaintiff was assigned to pressure wash buses which had become his

        daily assignment. As Plaintiff, was preparing to back the bus out of the parking lot, Sean Tate,

        another evening shift mechanic came outside and asked Plaintiff to assist him to back a bus out of

        the shop. After helping, Plaintiff went to lunch. Immediately after lunch, Plaintiff was assigned to

        replace the air lines on another bus. This was not customary. Usually, Plaintiff was assigned to work

        on the service lane at the conclusion of his lunch break.

62.     After working on the bus for approximately 1.5 hours, defendant James Lipscomb approached

        Plaintiff screaming irately. He accused Plaintiff of leaving the bus running behind the pressure was

        bay.

63.     Plaintiff replied that he had forgotten the bus was back there. Defendant Lipscomb began to verbally

        berate Plaintiff for the mistake. Plaintiff began yelling back at defendant Lipscomb stating that John

        Coleman and Kelvin Rufus continued to use knowledge of his disability to discriminate against and

        harass him and he had done nothing to intervene.

64.     Plaintiff went outside, backed the bus out and parked it. Plaintiff returned inside of the garage and

        attempted to continue replacing the air lines for the braking and suspension system. After working

        for approximately 20 minutes, Plaintiff realized that he was "hyper-focusing" on the altercation and

        could not focus on the task he was performing. Plaintiff recognized this was a dangerous situation

        which only time would cure. To protect himself, his coworkers and the public, Plaintiff immediately

        stopped working, packed his tool box, informed defendant James Lipscomb that he needed to use

        sick leave to cover the remainder of the shift for workplace stress.

65.     Plaintiff believes Kelvin Rufus started the bus and assigned Plaintiff to perform a task which would

        keep him far from the area where the bus was. Plaintiff had made a habit of following SOP verbatim

        because of the adverse working environment. This often meant Plaintiff took longer to perform tasks

        than if he had taken the same short cuts which had become the norm but it also meant that it made it

difficult for the defendants to discipline him without revealing the malicious intent behind their attacks upon Plaintiff.

66.     Plaintiff decided to go to the union hall to seek advice and help from his representatives after leaving work. Roland Jeter suggested that Plaintiff drop his ADA reasonable accommodation request. He informed Plaintiff that he was a member of the ADA panel committee. He warned Plaintiff against pursuing the request saying "normally these things don't go the way people think they will." This is the same bad advice he gave Plaintiff to have Plaintiff attend a meeting in the medical department without union representation in January of 2011and that Herman Brown used to convince Plaintiff to drop his grievance in May of 2010. On both of these prior occasions, management was permitted to engage in overtly discriminatory acts and conceal the documentation which supported Plaintiffs claims. The reasonable accommodation request created a paper trail that proves that management's claims of Plaintiff taking too long to complete tasks started after Plaintiff submitted the reasonable accommodation requests. Dropping his request for a reasonable accommodation would have disposed of the only documentation protecting him from WMATA's planned attack.

67.     Plaintiff returned to work the following day.  He was informed that individuals that leave work for stress are required to get a doctor's note before being allowed to return to work. Plaintiff went to his doctor's office and was given a doctor's note.

68.     Plaintiff went to the medical department the following day with a doctor's note from doctor Blaes. Plaintiff wrote confidential on the medical forms. He was verbally interviewed by Dr. Carl Johnson. Dr. Johnson asked Plaintiff if he felt like sharing anything which led to his sick report. Plaintiff explained in detail the events of that had been transpiring prior to and on April 3. He also informed Dr. Johnson of Dr. Blaes' advice to help him get through the situation. Dr. Carl Johnson agreed with the advice and issued Plaintiff a Return to Duty slip. Plaintiff reported to his division and began working. Two hours into his shift, defendant James Lipscomb approached Plaintiff to inform him that his Return to Duty was rescinded and that he was to immediately report back to the medical services office. Defendant Lipscomb attempted to justify this action stating that Plaintiff had failed

to tell Doctor Johnson that he reported sick for stress and if he had, a Return to Duty would not have been issued. This excuse was false. The defendants read the intake form Plaintiff filled out in the medical services office and figured that Plaintiff would not have spoken to Dr. Johnson about what had occurred.

69.     Upon Arriving back to the medical services offices plaintiff was escorted into a room and told that Ron Kelly would be with him shortly. Defendant Ron Kelly entered and informed Plaintiff that he was going to be required to attend an IME before being permitted to return to work. Plaintiff video recorded the entire 26 minute discussion. Defendant Ron Kelly is not a medical doctor. He does not possess a degree in a medical field which qualifies him to perform Medical Hold offs or Return to Duties. Medical hold offs and Return to Duty are the job of WMATA's staff physicians. The medical Hold off slip that defendant Ron Kelly gave Plaintiff did not contain his signature. The signature appears to be a bad attempt to forge Dr. Carl Johnson's signature.

70.     Plaintiff filed a workers compensation claim. Plaintiff's stress was caused by the hostile environment he had to work in daily. The workers comp claim was denied.

71.     Plaintiff had no choice but to submit to the IME with Dr. Fischer. This decision was made under duress and threat that he would not be allowed to return to work unless he agreed to submit to an evaluation by Ron Kelly. After a four hour evaluation, Dr. Fischer declared Plaintiff was fit to work in his position as a bus mechanic.

72.     The IME report was sent to defendant Gina Pervall. Plaintiff met with her on or about April 23, 2012. She asked Plaintiff if Dr. Fischer had discussed the results of the IME with him. Plaintiff informed her that he was aware that Dr. Fischer felt that he was fit to perform the duties of a bus mechanic. Next, defendant Pervall attempted to talk Plaintiff out of attending a meeting with the ADA panel to advocate for the reasons he thought a reasonable accommodation was needed. Plaintiff demanded that he be given the opportunity to make this request. Plaintiff video recorded this conversation. Dr. Pervall gave Plaintiff a Medical Return to Duty and signed it.

73.     Plaintiff sent Richard Sarles, WMATA General Manager, an email complaining of the

        discriminatory and retaliatory treatment he had been continuously exposed to.  He expressed concern

        for how this treatment could have effects that threatened the safety of his coworkers, the public, and

        himself.

74.     Plaintiff was scheduled to attend an ADA reasonable accommodation hearing on or about April 26,

        2014. In response to his complaint to WMATA's GM, Plaintiff was also scheduled for a meeting

        with the General Superintendent of Bus Maintenance, Philip Wallace and the Assistant General

        Superintendent of Bus Maintenance, Bruce Hobbs right after the ADA reasonable accommodation

        panel had concluded.

75.     On or about April 26, 2012, Plaintiff attended the ADA panel hearing. Upon arriving to WMATA

        headquarters he saw defendants John Coleman and James Lipscomb outside. Plaintiff was instructed

        to wait in the break room down the hall from the room the hearings were occurring.

76.     After waiting a long period of time, Plaintiff decided to eavesdrop to see what was being said about

        him. He heard defendant John Coleman lie to the panel members. He told them that the service lane

        accidents which led to his ADHD diagnosis in 2009 were classified as "Major Preventable"

        accidents. Those accidents were classified as "Minor Preventable." John Coleman was attempting to

        put information on the record that would give the panel justification for the coming attacks. The

        accidents were irrelevant to Plaintiffs ADA request. They had occurred 3 years prior. Per the union

        contract, accidents can only be held against a person for 365 days. More importantly, since being

        diagnosed with ADHD in 2009 and starting therapeutic treatment, Plaintiff had remained accident

        free. John Coleman had intentionally misrepresented occurrences to the ADA panel as facts. Plaintiff

        testified to the ADA panel attempting to explain why he should be granted a reasonable

        accommodation. Plaintiff was unaware that defendants James Lipscomb had also knowingly made

        untrue and disparaging remarks concerning his work history and character.

77.     The ADA panel was fully comprised of individuals from WMATA management, WMATA's office

        legal office and OHR. The ADA panel is one of the labor management committees authorized in

section 134 of the CBA between WMATA and Local 689 which requires members from management and the union to be present. Roland Jeter admitted to being a member on this committee when he attempted dissuade Plaintiff from attending. Jackie Jeter and WMATA agreed not to adhere to the guidelines set in the WMATA/ Local 689 CBA which requires members representing the union to be present in all labor management committees. This was an attempt to give the union plausible deniability concerning the preplanned outcome of Plaintiff's ADA hearing and shield itself from liability.

78.   Plaintiff met with Phillip Wallace, the General Superintendent of Bus Maintenance and Bruce Hobbs the Assistant General Superintendent of Bus Maintenance after leaving the panel hearing. This meeting was scheduled in response to the email Plaintiff sent WMATA's general manager, Richard Sarles begging him to intervene in the hostile work practices implemented by John Coleman to target Plaintiff. Due to MD's 2 party consent law which made secretly recording meetings illegal, Plaintiff asked Herman Brown to serve as a witness to the discussions between him and the highest ranked managers within the department of Bus Maintenance.

79.   Phillip Wallace offered to place Plaintiff on paid administrative leave while he investigated Plaintiff's claims of discrimination retaliation and harassment. As an alternative, he asked Plaintiff if he would agree to being temporarily moved to Montgomery Division. Plaintiff was not prepared to make a decision of such importance without having the chance to think it over.  Phillip Wallace gave plaintiff the remainder of the week off and instructed Plaintiff to return to his office on Monday April 30, 2012 at his normal report time.

80.   Plaintiff did as he was instructed and returned the following Monday at 2:00 pm. Plaintiff informed Phillip Wallace that he didn't consent to being placed on administrative leave. He did agree to allow Mr. Wallace to move him to Montgomery Division.

81.   The defendants planned to document the proposed paid administrative leave as a removal from work for safety concerns. By refusing to be placed on paid administrative leave, Plaintiff unknowingly dismantled The Union and WMATA's cover story that was being prepared for the EEOC.

82.     The first day, Plaintiff was scheduled to report to Montgomery Division, Plaintiff received a call from his shop steward Herman Brown. Plaintiff was informed that the union and WMATA management had come to an agreement for his temporary transfer. Plaintiff was informed that he would be required to enroll in the Employee Assistance Program (EAP) as a condition to the transfer. This was the 3rd time that Management and the union attempted to force Plaintiff into the EAP program. Jackie Jeter agreed to allow WMATA management place Plaintiff in EAP as a way of terminating him. Plaintiff adamantly denied this condition. EAP is under the medical services and Compliance branch which is run by defendant Lisa Cooper –Lucas. Plaintiff refused to put himself in a position that would allow the same people to target and unjustifiably terminate him as they had done previously. Plaintiff rejected this condition and asked Herman Brown to call to Western Division to inform them that he would be late. After calling Jackie Jeter and Phillip Wallace, Herman Brown called Plaintiff back and informed him to report to Montgomery Division as planned. The Plaintiff was informed that that he would not be required to enroll in the EAP.

83.     Jackie Jeter and Douglas Taylor were instrumental in allowing WMATA's management to target Plaintiff. She instructed the union's attorney to use the arbitration hearings to put statements on the record which would give WMATA legal loopholes to avoid being held accountable. She has agreed to settlements which have harmed Plaintiff and protected WMATA.

84.     Plaintiff worked at Montgomery Division for approximately one month servicing and repairing buses without any issues. Approximately two weeks into the transfer, Plaintiff contacted Roslyn Rikard to ask about his request for reasonable accommodations. Amy Celeste-Quillen sent an email to Plaintiff stating that his requests were under review by the COUN department and would be released soon.

85.     Herman Brown informed Plaintiff that his grievance/complaint against defendant John Coleman had been settled with defendant Coleman agreeing to rotate Plaintiff into the regular work schedule more often but deny any discrimination or retaliation. This settlement was of no consequence because Plaintiff was no longer at Western Division.

86.     In response to Plaintiff's request for reasonable accommodation, he was informed that the ADA committee declared him a "direct threat" and referred him to the medical department. Defendant Gina Pervall medically disqualified Plaintiff on May 24, 2012.  Roslyn Rikard, Amy-Celeste Quillen and defendant Lisa Cooper-Lucas conducted the meeting with Plaintiff informing him of what had transpired.

87.     The defendants had planned claim Plaintiff was taking too long to complete his task but could not when he refused to drop his request for a reasonable accommodation. They attempted to force him into EAP twice to have a clinician lie concerning his fitness for duty but he would not go. As a last result, the defendants' had to fabricate incidents which were not contained in Plaintiff's record to attempt to justify their actions.

88.     Plaintiff filed an appeal providing documented evidence that each reason that was said to have led to the decision of declaring him a direct threat were false. The factual and logical arguments contained within the appeal proved that the stated reasons for denying and/or choosing not to make a decision whether to grant or deny Plaintiff's reasonable accommodations and were also false.

89.     WMATA had no legitimate concern or reason to not grant Plaintiff's accommodation request and declare him a direct threat. In reality Plaintiff's medical disqualification was a de facto termination. Having already failed at make his 2010 termination stick, the medical disqualification was a way to remove Plaintiff from work to cause him immediate financial harm and mounting psychological harm as time passed. The documentation states Plaintiff was only medically disqualified from the Bus Mechanic position, but he was not permitted to apply for any safety sensitive positions for which he was qualified.

90.     Gary Baldwin, WMATA's Chief Human Resources Officer denied Plaintiff's appeal after admitting that the 3 incidents which led to the ADA panel's decision were false. In an attempt to rationalize his decision not to grant Plaintiff's appeal in the face of well laid out and logical arguments, Gary Baldwin stated that Plaintiff's violent act of shoving a chair in the March 2011 Joint Labor

Management Committee hearing led him to "believe" that Plaintiff was operating a forklift so far above the shop speed limit that it was bouncing off of the ground.

91.     Plaintiff filed grievances to contest his wrongful medical disqualification in or about June 5, 2012. The grievances were voted to arbitration by the members of local 689. Plaintiff also sought assistance from the General Manager, Richard Sarles directly without contacting his Union. In October of 2012, he met with Larisa Alexander on multiple occasions. She was Richard Sarles' assistant. She ensured Plaintiff that she would look into his concerns regarding the false statements which led to his medical disqualification and termination. No action was taken to remedy the situation. Plaintiff video recorded both encounters on his cellular phone.

92.     After informing WMATA that he would seek to expose the corruption and lies which led to his termination and medical disqualification, as well as other decisions by management that endangered the public's safety such as putting a bus with braking issues on back on the street, and a confirmed incident where management officials altered reports to conceal electrical problems which caused some trains to randomly open the doors on the wrong side. In response, Plaintiff was informed that a Station Manager class would be created so that he could return to work as a Rail Station Manager. Plaintiff applied for the position and was the top student of his class. Plaintiff was passed over as the class valedictorian despite having the best test average and performing flawlessly on his certification station walk through. Plaintiff was certified and began working as a station manager in March of 2013.

93.     Plaintiff attended an arbitration prep session with Doug Taylor and Larry Lockley in April of 2013. Doug Taylor put on long show acting as if he was trying to figure out what the best way to argue the grievance. From previous interactions Plaintiff knew Doug to be well prepared but went along with the theatrics. He could not contest the strategy anyway since Mr. Taylor was the Union's lawyer not Plaintiff's. Mr. Taylor was obligated to protect the Union's interest in arbitration not Plaintiff.

94.     Mr. Taylor "decided" the union's best position would be to argue Plaintiff did not have a disability. Doug Taylor and Jackie Jeter planned to use the arbitration hearing to help WMATA and the union

escape liability under the Americans with Disabilities Act and Rehabilitation Act. The arbitration was not pursued for the purpose of reversing Plaintiff's medical disqualification. It was only conducted for the purpose creating documentation that would make pursuing a lawsuit against Local 689 and WMATA more difficult.

95.  In arbitration, defendant. Taylor proceeded as planned. He concealed recorded audio evidence from the arbitration record that proved the defendant's stated reasons for actions taken against Plaintiff were false. He "proffered" that the union would have proven its case if it presented its case. He misinformed Plaintiff that if the procedural objections were ruled in the unions favor, the proffer would be accepted as a successful argument. During arbitration, the defendants took care to ensure the transcripts produced during Plaintiff's reasonable accommodation request hearing only contained the portions of Plaintiff testifying and not to the portion that included what was said before he entered the room. The defendants ensured that Plaintiff did not find out that defendant Lipscomb knowingly made false statements concerning plaintiffs work history to the members of the ADA reasonable accommodation panel. Defendant Lipscomb lied to the committee members concerning the three fictitious incidents which were said to be the reason Plaintiff was declared a direct threat and medically disqualified.

96.  Douglass Taylor informed Plaintiff that the arbitration decision should be issued in early August of 2013. A partial decision was rendered on or about October 29, 2013. Initially, Defendants, WMATA, and Local 689Jackie Jeter through their counsel, Doug Taylor, and Donna Gaffney instructed Arbitrator Shayam Das to delay rendering his decision until the 180 day statute of limitations for Labor Management Act Claims had expired. Plaintiff's constant email prevented them from sticking to this plan.

97.  Defendant Local 689has been covertly working with Management and against Plaintiff from March of 2010 through the time when Ralph Bonucelli attempted to convince Plaintiff to switch his work location in the system pick.

98.     The interim decision required Plaintiff to attend a second Independent Medical Evaluation. The decision to require Plaintiff to submit to a second IME was based on WMATA's failure to produce Dr. Fischer's IME report. In the decision Shyam Das wrote that he believed Dr. Pervall's sworn testimony that she required Plaintiff to attend the IME with Dr. Fischer because she was concerned that Plaintiff's medication dosage was in excess of normal range of ADHD treatment dosages. He says believed defendant Pervall's decision to medically disqualify Plaintiff arose from concerns she developed after hearing Plaintiff's testimony before the ADA panel committee.

99.     The arbitration award admits WMATA failed to provide just cause for medically disqualifying under the terms of the Collective bargaining agreement yet the Union was not awarded a victory. Instead, Shyam Das required Plaintiff undergo more testing to prove his fitness to work as a mechanic. The defendants colluded to use arbitrator Das in each of the grievances filed by Plaintiff should they not be able dispose of them before they reached arbitration knowing that his decisions would go whichever way they needed them to go. Arbitrator Das was paid to render a decision that would allow the defendants a second chance to fabricate reasons to keep him from returning to his position as a bus mechanic. A decision which allowed Plaintiff to return to work as a bus mechanic would further damage WMATA's ability to defend its self in case number 1:12-cv-00940.

100.    Plaintiff received documentation throughout November and December of 2013 through discovery in 1:12-cv-00940 gives a detailed account that shows defendants Ron Kelly and Lisa Cooper-Lucas made the decision to require Plaintiff to submit to an Independent Medical Evaluation and planned to have him medically disqualified as a Bus Mechanic by using defendant Pervall provide false information concerning Plaintiff's prescription dosage to the Dr. Fischer. Defendants Cooper-Lucas and Kelly are not medical doctors. The responsibilities of the positions they hold in WMATA do not permit them to make medical decisions or make decisions that will have medical consequences for employees. They do not possess the required government issued licenses required to practice medicine. These responsibilities belong to WMATA's staff and or contract physicians. A Master's Degree and license in counseling is not a medical license.

101.    In March 2012, defendant Gina Pervall knowingly misrepresented information concerning Plaintiff's

medication and dosage to Dr. Fischer. She reported that Plaintiff was prescribed and taking 50 mg

Vivance XR daily, 20mg of Adderall XR daily and 10mg Adderall XR as needed. Having received

the Physicians Statement from Dr. Blaes as part of Plaintiff' reinstatement and having signed off on

his initial Prescription Reporting Form during Plaintiffs reinstatement physical in October of 2011,

she was aware of Plaintiff's correct medication and dosage. She intentionally misrepresented this

information to Dr. Fischer in a failed attempted to trick Dr. Fischer into stating that Plaintiff's

ADHD prescription was in excess of acceptable medical dosage to corroborate the past false claims

that Plaintiff was a abusing his medication and addicted to it.  Dr. Pervall is not a psychiatrist and

does not understand how different stimulant medications require different doses to for equivalent

therapeutic effects. The dosage that Dr. Pervall stated the plaintiff had been prescribed and taking is

equivalent to the dosage Dr. Fischer recommended that Plaintiff's psychiatrist to increase his dosage

to.

102.    Stimulant medications are mostly used to treat ADD and ADHD. It is also used to treat Narcolepsy.

Because Defendants Pervall is not a psychiatrist and does not deal with these medications often, she

was unaware that there was a regulatory issue that caused Adderall to be placed on back order for

nearly a year. Adderall was not available when Defendant Gina Pervall intentionally misidentified

plaintiff's medications and dosage to Dr. Fischer. This is the specific reason that Plaintiff's doctor

switched his medication to Vivance.

103.    Dr. Pervall's statements in arbitration were fabricated to cover up her misdeeds and the misdeeds of

defendants Ron Kelly and Lisa Cooper-Lucas. Prior to beginning her testimony Defendant Pervall

was sworn in by a Court reporter. Defendant Gina Pervall perjured herself by making these

statements which she knew to be false during her sworn testimony in the May 2013 arbitration.

104.    Also included in the documentation that Plaintiff received between November and December of

2013 was Dr. Fischer's IME report. Plaintiff asked Doug Taylor to present the report to arbitrator

Shayam Das so he would not have to submit to a second IME.  Doug Taylor refused to do so.

Defendant Doug Taylor and Jackie Jeter had made an agreement with WMATA to have arbitrator Das issue a decision which would be used to force Plaintiff into another IME where WMATA could pay a Psychiatrist to say Plaintiff had another psychiatric condition which justified the direct threat declaration and in order to help the defendants create a defense for their discriminatory and retaliatory actions.

105.   [This paragraph was a duplicate of something that was stated previously but remains to keep references to paragraph numbers from changing]

106.   The defendants conspired to force Plaintiff to submit to an IME under the premise that it was the only way that he would be permitted to have the medical disqualification reversed. The defendants were manipulating Plaintiff into submitting to a this second evaluation to have false claims concerning his character and psychological condition put in a record in an attempt to retroactively justify their May 2012 decision to medically disqualify him and leave him out of work.

107.   Jackie Jeter, Douglass Taylor, Defendant Lisa Cooper-Lucas and Defendant Donna Gaffney agreed to hire Dr. Albert Forrester in Timonium MD to perform the second IME. They switched to defendant Hertzberg to perform the second IME after Dr. Forrester decided that he would not agree to falsify a psychiatric and or psychological profile about Plaintiff.

108.   In exchange for financial compensation and a promise to be retained as WMATA's expert witness in this civil action, Defendant Hertzberg agreed create a report which would appear to be an unbiased and independent opinion concerning Plaintiff's psychiatric and psychological health. In reality, the report was intended to create an official record which falsely labeled Plaintiff with psychiatric and/ or psychological conditions that he did not have for the purpose of shielding WMATA and the individual capacity defendants from litigation for past and future discriminatory, retaliatory, defamatory attacks upon Plaintiff.

109.   Dr. Hertzberg wrote a report contain disparaging statements of plaintiffs psychological state of mind. He intentionally lied and disparaged Plaintiff good when he reported Plaintiff had Paranoid Personality Disorder (PPD), and found Plaintiff unfit to safely perform the duties of a bus mechanic.

110.    Later he allowed Lisa Cooper-Lucas and Donna Gaffney to create another report and sign his signature claiming the PPD made Plaintiff unfit to work in any position at WMATA due to uncontrollable anger issues. This was done with complete disregard for the psychological emotional and physical consequences to Plaintiff and his family.

111.    There are approximately 18 observations and statements within Dr. Hertzberg's report which directly contradict the traits of paranoid personality disorder. Furthermore PPD by definition is a personality disorder. Personality disorders are not medical conditions. A personality disorder is not a legitimate reason for a person to be deemed unfit to perform a job; especially one such as a mechanic where a major portion of the responsibilities require an individual to work autonomously.

112.    Donna Gaffney Douglas Taylor Lisa Cooper-Lucas and Jackie Jeter agreed to alter Dr. Hertzberg's report to included erroneous statements about subjects which Dr. Hertzberg and Plaintiff did not discuss. They added these sections in an attempt to insulate Jackie Jeter and Local 689 from litigation for choosing not to arbitrate Plaintiff's grievances concerning other matters for which grievances had been pending. As a result of being falsely identified as a person with Paranoid personality disorder, Plaintiff was not allowed to return to his position as a bus mechanic and was forced remain in the Station Manager position. The station manager position was not well suited to Plaintiff. Even though he performed the duties of this position well, the difficulties of dealing with WMATA's irate customers made him despise coming to work. He began to experience mild depression which made his ability to find another job extremely difficult.

113.    Afterwards, Lisa Cooper Lucas and Donna Gaffney altered Dr. Hertzberg's original report to create a fictitious report which he could not safely perform the duties of a Station Manager or any other job a WMATA because his ADHD intensified and PPD symptoms could lead to sudden violent attacks against employees and  customers.  Plaintiff was removed from his current position of Station Manager in February of 2014 as a result of this fake report.

114.    Doug Taylor, defendant Donna Gaffney and Shayam Das reconvened on or about April 7, 2014 to issue a final decision derived from the May 2013 arbitration. Using that documentation the board

unanimously agreed that Plaintiff was not entitled to be reinstated to his position as a bus mechanic or to receive his back pay.

115.    Plaintiff was medically disqualified by defendant Renee Y. Thomas, a counselor at Cahaba counseling in Birmingham Alabama on or about April 8 2014. She was not an employed by WMATA at any time relevant to this action. She agreed to allow Lisa Cooper- Lucas to use her name and credentials to remove Plaintiff from work so that WMATA would not have to force an actual employee into exposing themselves to civil liability claims. Renee Y. Thomas is not a doctor. She lacks the necessary state and or federal licenses that would qualify her to make medical decisions or to medically disqualify employees. The letter which bears her name and signature was actually written and signed by defendant Lisa Cooper-Lucas.

116.    To prevent Plaintiff from investigating this, WMATA decided to continue paying Plaintiff on paid administrative leave for 7 weeks.  Plaintiff contacted personnel in the Human Resources Department to gather information concerning the peculiar arrangement. On two occasions during this 7 week period, plaintiff contacted top personnel within the Office of Human Resources concerning the failure of his administrative leave pay to be processed. On each occasion the problem was immediately corrected and Plaintiff was paid.

117.    On or about Wednesday, May 28, 2014, Winston Ellis and other senior personnel instructed LuJaun Allen, the supervisor of payroll for hourly employees to remove money from Plaintiff's checking account as a last ditch effort to prevent  Plaintiff from taking defendant Lisa Cooper- Lucas' deposition testimony in civil action 1:12-cv-00940.

118.    The defendants removed Plaintiff from administrative leave in an attempt to create a cover story for money being stolen from Plaintiff's bank account.  These types of blatant attacks had become the norm. In or about December of 2014, John Coleman instructed Joe Bowie to physically assault Plaintiff to get an emotional response which he could be terminated for. Plaintiff filed a criminal police report with WMATA Transit Police. Plaintiff was continuously harassed and punished for engaging in activities that were required to be performed by employees. He was suspended for 10

days for going to Western Division to Fax his prescription form and for refilling his water bottles during a mandatory 16 hour shift despite the fact that Western was the closest and most convenient division to the stations he was working that day

119.    Plaintiff's 2012 medical disqualification, the subsequent attacks and adverse employment actions which constitute disability harassment, retaliation, and hostile working environment were pursued, implemented and upheld in contravention of Plaintiff federally protected rights.

120.    Plaintiff has suffered extreme and continuing irreparable harm in the form mental anguish which has negatively affected all of his relationships, caused his motorcycle repair shop to fail, caused an exacerbation of medical issues and created psychological problems. He has lost his enjoyment of life as the result of the joint actions of the WMATA defendants, Dr. Hertzberg  Local 689 reps

121.    Plaintiff's 2012 medical disqualification, the subsequent events which constitute disability harassment, disability discrimination, retaliation, and hostile working environment were pursued, implemented and upheld with zero regard of Plaintiff federally protected rights.


## COUNT I - IV
### DISABILITY DISCRIMINATION

122.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

123.    Plaintiff is qualified for the position of Bus Mechanic D at WMATA and met or exceeded the Company's performance expectations.

124.    Plaintiff is an individual with a disability within the meaning of the Rehabilitation Act, and the new regulations governing the Americans with Disabilities Act (ADA). 42 U.S.C. § 12102(2)(B), 29 CFR § 1630.2(h)

125.    Plaintiff could perform the essential functions of the position of Mechanic and Station Manager, with or without a reasonable accommodation.

126.    WMATA had a record of Plaintiff's disability and related medicinal treatment. 29 CFR § 1630(k).

127.     WMATA perceived Plaintiff as disabled.

128.     Local 689 perceived Plaintiff as disabled.

129.     WMATA regarded Plaintiff as an individual with a disabling impairment.  29 CFR §

1630.2(g),(j)(2).

130.     Local 689 regarded Plaintiff as an individual with a disabling impairment.  29 CFR §

1630.2(g),(j)(2).

131.     Defendants failed to offer or provide Plaintiff a reasonable accommodation.

132.     Plaintiff could have performed the essential functions of Mechanic or another vacant, safety-

sensitive position with or without a reasonable accommodation.

133.     Defendants, failed to engage in an interactive process with Plaintiff to ascertain the nature of his

disability or find a reasonable accommodation. 29 CFR § 1630.1(c).

134.     Defendants subjected Plaintiff to unlawful harassment due to his disability under the Rehabilitation

Act and ADA regulations.

135.     Plaintiff suffered adverse employment actions, including but not limited to being suspended without

pay, and being medically disqualified

136.     Providing a reasonable accommodation for Plaintiff would not have posed an undue hardship on

WMATA or its operations.

137.     WMATA and Local 689 failed to provide Plaintiff a reasonable accommodation for his perceived,

record of, and/or actual disability in violation of the Rehabilitation Act and ADA and its regulations.

42 U.S.C.§ 12102 (5)(A), 29 CFR § 1630.

138.     WMATA medically disqualified. Plaintiff on the basis of his perceived, actual and/or record of

disability in violation of the Rehabilitation Act and ADA and its regulations.  42 U.S.C.§ 12102

(5)(A), 29 CFR § 1630.

139.     WMATA and Local 689 medically disqualified Plaintiff on the basis of his perceived, actual and/or

record of disability in violation of the Rehabilitation Act and ADA and its regulations.  42 U.S.C.§

12102 (5)(A), 29 CFR § 1630.9(d) and 1630.16(a), (f).

140.      WMATA, at all times relevant hereto, had actual and constructive knowledge of the conduct, as described herein, of its managerial employees, including but not limited to Lisa Cooper-Lucas,  Ron Kelly, and John Coleman, Jackie Jeter, James Lipscomb, Gina Pervall, Donna Gaffney.

141.      Plaintiff is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendants, and their agents, have engaged in discriminatory practices against him which are not yet fully known.  At such time as said discriminatory practices become known to him, Plaintiff will seek leave of court to amend this Complaint in that regard.

**COUNT V and VI**
**RETALIATION**

142.      Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

143.      Plaintiff engaged in protected activity by asserting his rights under the Rehabilitation Act, Americans with Disabilities Act and its regulations, by filing charges of discrimination and retaliation with the EEOC and a civil lawsuit in US District Court against WMATA.

144.      Plaintiff engaged in protected activity by filing a Charge of Discrimination against WMATA with the EEOC on or about January 20, 2011 amending same on or about March 16 and April 24, 2011, and a new charge discrimination on or about October 23,2012 and amending it on or about January 9 2014.

145.      Plaintiff engaged in protected activity by filing a Charge of Discrimination with the EEOC against Local 689 on or about January 9, 2014.

146.      Plaintiff suffered adverse employment actions, including but not limited to being suspended without pay, medically disqualified, and harassed.

147.      There is a causal relationship between Plaintiff's protected activity described above and the adverse employment actions taken by WMATA and Local 689 against him.

148.      WMATA's and Local 689's adverse employment actions against Mr. McFadden were motivated by his protected activity(ies) in violation of the Rehabilitation Act, ADA and its regulations.

32

149.    Defendants subjected Mr. McFadden to unlawful harassment due to his protected activity(ies) under the Rehabilitation Act and ADA regulations.

150.    WMATA and Local 689, at all times relevant hereto, had actual and constructive knowledge of the conduct, as described herein, of its managerial and administrative employees, including but not limited to  Donna, Gaffney  Lisa Cooper-Lucas, Ron Kelly, Gina Pervall, and John Coleman, Jackie Jeter Roland Jeter and Douglass Taylor and others.

151.    Plaintiff is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendants, and their agents, have engaged in discriminatory practices against him which are not yet fully known.  At such time as said discriminatory practices become known to him, Plaintiff will seek leave of court to amend this Complaint in that regard.

## COUNT VII
### HOSTILE WORK ENVIRONMENT

152.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

153.    WMATA is liable for the ongoing harassment of Plaintiff on the basis of his disability under sections 501 and 505 Rehabilitation Act.

154.    Local 689 is liable for the ongoing harassment of Plaintiff on the basis of his disability under the Americans with Disabilities Act as Amended and under sections 102 and 103 of the Civil Rights Act of 1991

## COUNT VIII
### BREACH OF DUTY OF FAIR REPRESENTATION

155.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

156.    Local 689 has violated its duty of fair representation by colluding with WMATA to allow plaintiff to be unfairly targeted and harassed on the basis of his disability, sabotage arbitration decisions for some of grievances and choosing not to arbitrate other grievances.

157.	Local 689 violated its duty of fair representation in its perfunctory handling of Plaintiff's grievances and arbitration.

158.	Local 689's arbitrary handling of Plaintiff's grievances was based on improper motive due to Plaintiff critical statements for past and present violation of its breach of duty of fair representation.

159.	Local 689 acted inexcusably neglectful when they allowed WMATA to expose Plaintiff to unyielding harassment, failed to arbitrate Plaintiff's grievances and sabotaged his medical disqualification grievance

160.	Local 689 perfunctorily settled grievances adverse to Plaintiff and beneficial to WMATA.

161.	Local 689 perfunctorily arbitrated grievances Plaintiff filed to partially remedy issues arising out of the vague language contained in the September 2011 settlement agreement.

162.	In May of 2013, Local 689 perfunctorily arbitrated grievances concerning Plaintiff's medical disqualification.

163.	An arbitration decision was issued on October 29, 2013 regarding Plaintiff's grievances reveals that Douglass Taylor, at the direction of Local 689 intentionally withheld critical evidence from the brief it prepared for the arbitration to justify continued harassment of Plaintiff.

164.	Local 689 violated its duty of fair representation in its perfunctory handling of Plaintiff's grievances and arbitration by allowing WMATA to alter the scope of his medical disqualification to include  Dr. Hertzberg's February 2014 IME report.

165.	Local 689 violated its duty of fair representation in its perfunctory handling and refusal to arbitrate Plaintiff's truck driver position grievances.

166.	Local 689's arbitrary handling of Plaintiff's grievances was based on improper motive in response to Plaintiff critical statements about the union throughout the timeline contained in this complaint and to cover up its past improprieties.

**COUNT IX – XX**
**DEFAMATION**

167.	Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

168.     Gina Pervall is jointly and severally liable of defamation for her slanderous and libelous statements to the Dr. Fischer concerning Plaintiff's disability and the medication he takes to ameliorate its symptoms. Count (Count 1)

169.     Gina Pervall is jointly and severally liable of defamation for the  secret medical records she prepared for the ADA panel and for concealing Dr. Fischer's report from the ADA panel (Count 2)

170.     John Coleman is jointly and severally liable of defamation for his slanderous statements about Plaintiff to the ADA panel. (Count 3)

171.     James Lipscomb is jointly and severally liable of defamation for his slanderous statements about Plaintiff to the ADA panel. (Count 4)

172.     Lisa Cooper-Lucas is jointly and severally liable of defamation for her slanderous and defamatory statements to ADA panel. (Count 5)

173.     Lisa Cooper-Lucas is jointly and severally liable of defamation for her slanderous and libelous statements to those present in arbitration (Count 6)

174.     Lisa Cooper-Lucas is jointly and severally liable of defamation for her slanderous and libelous statements to Dr. Hertzberg. (Count 7)

175.     Dr. Hertzberg is jointly and severally liable of defamation for his libelous statements in his IME report. (Count 8)

176.     Lisa Cooper-Lucas is jointly and severally liable of defamation for fabricating documentation claimed to be Dr. Hertzberg's second IME report. (Count9)

177.     Donna Gaffney is jointly and severally liable for forging Dr. Hertzberg's name on the second IME report. (Count 10)

178.     Lisa Cooper –Lucas is jointly and severally liable for fabricating documentation with Renee Y. Thomas' name medically disqualifying Plaintiff. (Count 11)

179.     Each of the written and verbal statements was published to a third party.

180.    Plaintiff has suffered damage to his good name character as a result of the individual capacity defendants' false statements which led to his medical disqualification in May of 2012 and April of 2014.

181.    As a result Plaintiff has incurred economic loss, loss of business opportunities, loss of his home experienced severe mental anguish experienced a loss of joy experienced damaged relationships and an exacerbation and intensifying of psychiatric and psychological impairments all parties are jointly and severally liable for each count of

## COUNTS XXI-XXXII
### CIVIL CONSPIRACY (DEFAMATION)

182.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

183.    Each of the individual defendants identified in the 11 counts of defamation and ATU local 689 are jointly and severally liable for each count of the 11 counts of defamation raised. They made agreements, to take illegal action toward Plaintiff and acted to follow through with the plan. Each person had a role and took concerted action to accomplish the goals. Plaintiff has suffered damages because of their malicious actions.

## COUNT XXXIII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

184.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

185.    Dr. Hertzberg is liable for 1 counts of Intentional infliction of emotional distress for authoring a false IME report with reckless disregard to the emotional harm it caused Plaintiff.

186.    Plaintiff has suffered extreme irreparable harm as a result of the defendant's intentional attacks

## COUNTS XXXIV - XLII
### CIVIL CONSPIRACY (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

187.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 121, inclusive, and incorporates the same by reference as though set forth fully herein.

188.   The individual capacity defendants are jointly and severally liable for the torts defamation and intentional infliction of emotional distress. They made agreements, to take illegal action toward Plaintiff. Each person had a role and took concerted action to accomplish the goals. Plaintiff has suffered damages because of their malicious actions.

189.   Each of the individual capacity defendants and local 689 are jointly liable for conspiracy to intentionally inflict emotional distress upon the Plaintiff to trigger defensive reactions that would make him appear irrational and out of control for the purpose of fabricating a legal defense and escape liability for past and current wrong doings.

## PRAYER FOR RELIEF

190.   As a direct and proximate result of Defendants' actions, Mr. McFadden has experienced   and will continue to experience pain and suffering, and extreme and severe mental anguish and emotional distress.  He has incurred and will continue to incur medical expenses for treatment and for other incidental expenses.  Therefore, for each Count alleged in this Complaint, Mr. McFadden is entitled to medical expenses and compensatory damages, where permitted.

191.   Defendants' unlawful actions were undertaken with malice and/or with reckless disregard for Mr. McFadden's rights.  Therefore, for each Count in this Complaint, Mr. McFadden seeks punitive damages, from Amalgamated Transit Union Local 689 and each individual defendant.

192.   WHEREFORE, Plaintiff prays for the following relief:

   a.   An order declaring WMATA's acts and practices complained of herein violate Section 501 of the Rehabilitation Act, as enumerated and as interpreted by the Americans With Disabilities Act and its regulations;

   b.   An order declaring Local 689's acts and practices complained of herein violate Title I and V Americans With Disabilities Act and its regulations, sections 102 and 103 of the Civil Rights Act of 1991and section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 for breach of duty of fair representation;

   c.   An order restraining and permanently enjoining Defendants' illegal acts and practices;

d.   Immediate placement into the position of Truck Driver which he was denied.

e.   Unpaid back wages and salary, bonuses, and benefits;

f.   Plaintiff's costs, and past and future pecuniary losses;

g.    Equitable and restorative relief, including but not limited to front pay;

h.   General, special, liquidated, treble and compensatory damages for all claims;

i.   Punitive damages, against Local 689 and the individual capacity defendants;

These damages equate to **$10,000,000.00** in United States currency. In addition Plaintiff seeks

j.   Pre-judgment and post-judgment interest where applicable;

k.   Plaintiff's attorney's fees and expert witness fees; and

l.   All other relief as the Court may deem just and proper.


Respectfully Submitted,                                    _____/S/_____

                                                         COREY MCAFADDEN (Pro Se)